## J. A. SKELLEY, Appellant, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Respondent.

**Springfield Court of Appeals, December 11, 1913.**

1. **LIBEL: Statutory Definition: Common Law.** The statutory definition of libel found in Sec. 4818, R. S. 1909, is not different from the common law definition.

2. ————: **Innuendo: Function of.** Where language is ambiguous and may have either a harmless or an injurious meaning, it is the function of an innuendo to point out the meaning which the plaintiff claims to be the true meaning and the one upon which he relies to sustain his action.

3. ————: ————: **Necessary Part of Petition When.** Where alleged libellous words have a double meaning, one libellous, the other, not, the innuendo is a necessary part of the petition. It is not to be enlarged or departed from either when the proof is made by extrinsic evidence or is inferred from the words themselves.

4. ————: **Innuendo: Binding on Plaintiff.** In an action for libel the plaintiff is bound by the meaning he puts upon the language published by his innuendo.

5. ————: **Petition: Necessity of Innuendo.** A petition in an action for libel alleged that the defendant falsely charged, plaintiff with larceny by publishing the charge that the plaintiff had confiscated certain posts belonging to defendant. *Held*, unless the word "confiscated" necessarily imported larceny, the plaintiff could not recover without proof of the innuendo.

6. **LIBEL: "Confiscated": Not a Libellous Word.** The freight agent of the defendant company in a freight expense bill charged, among other items, for "8 company fence posts confiscated by shipper," in the shipment of a carload of logs. *Held*, that the word "confiscated" did not *per se* import larceny of the logs and was not libellous.

Appeal from Jasper County Circuit Court, Division Number One.—*Hon. Joseph D. Perkins*, Judge.

AFFIRMED.

*Shannon & Phelps* for appellant.

(1) An innuendo may be treated as surplusage where it is used in connection with words which are unequivocal and actionable *per se,* and where plaintiff has, in action for libel, by an innuendo, put a meaning on the alleged defamatory matter which is not supported by its language or by proof, the court may, nevertheless, submit the case to the jury, if the publication is defamatory *per se.* Callahan v. Ingram, 122 Mo. 355; Cook v. Globe Printing Co., 227 Mo. 525. (2) The word "confiscate" when used to characterize the act of an individual, is always used in reprobation of such act, and it is therefore libelous *per se.* (3) In order to be libelous *per se,* it is not essential that words should involve an imputation of crime. 25 Cyc. 253; McGinnis v. Knapp, 109 Mo. 131; Sullivan v. Commission Co., 152 Mo. 268. (4) Whenever the libelous intent, or seeming libelous intent, appears, though dimly and vaguely, as "through a glass darkly" the question becomes one for the jury to say whether the meaning was libelous or defamatory. McGinnis v. Knapp, 109 Mo. 150.

*W. F. Evans* and *Mann, Todd & Mann* for respondent.

(1) From the meaning of the word "confiscate" it is impossible for an individual to confiscate anything. Ware v. Hylton, 3 U. S. 199, 234, 1 L. Ed. 568, 584; State ex rel. v. Sargent, 12 Mo. App. 228, 234; Trimble v. Foster, 87 Mo. 49; Hall v. Adkins, 59 Mo. 148; Newell on Slander and Libel (2 Ed.), 117; Ogden v. Riley, 14 N. J. L. 186; Upham v. Dickenson, 50 Ill. 97; Carmichael v. Shiel, 21 Ind. 66; Allen v. Hillman, 12 Pick. (Mass.) 101. (2) The word "confiscate" is not actionable *per se.* 25 Cyc. 304, *et seq.;* Diener v. Star Chronicle Pub. Co., 232 Mo. 416, 428; Diener v. Star Chronicle Pub. Co., 230 Mo. 613.

STURGIS, J.—Action for libel. No evidence was offered except by plaintiff. The court sustained a demurrer to this evidence, resulting in plaintiff's appeal.

The pleadings and evidence may be considered together. The words charged as constituting the libel are "For 8 company fence posts at 10c confiscated by shipper, 80," and this language is alleged to have been one item and part of a freight bill sent by the defendant for collection to the consignee of a car of walnut logs shipped by plaintiff over defendant's railroad. The matter arose in this way: The plaintiff was engaged in shipping walnut logs and in November, 1912, shipped a carload from Verona, Missouri, consigned to a firm in Kansas City; the plaintiff used eight fence posts in loading the logs and securing them on the car; the local agent of defendant at Verona erroneously thought that plaintiff used posts belonging to defendant from a pile of such posts on its right of way. In making out the waybill he made notation of same in the language above set out with the item of freight charges and other items and forwarded same to the defendant's office at Kansas City. A freight bill was then made out by a clerk of defendant in the Kansas City office, who it was agreed did not know and had never heard of defendant, and presented it to the consignee for payment and the same was paid. This freight bill is as follows:

FREIGHT BILL.

Consignee: Penrod Walnut and Veneer Company,
To St. Louis & San Francisco Railroad Co., Dr.
Billing Station, Verona. Consignor: J. A. Skelley.
Road issuing Waybill: St. L. & S. F. R. Co.

77 walnut logs, freight charges ......$67.41
5 days demurrage at Verona ......... 5.00

For 8 company fence posts, at 10c
Confiscated by shipper ............ .80
For rearranging logs, etc. ......._...... 9.25

Total charges ................$82.64

This freight bill contains the alleged libel and its presentation to this consignee for payment constitutes its only publication.

The plaintiff proved that the fence posts in question were not the property of defendant as defendant's local agent supposed, but that he bought the same from a local dealer at Verona. The local agent, who made out the waybill from which this and other items were copied into the freight bill above set out, was a witness for plaintiff and testified: That the word confiscated as used upon this bill is a term used by railroad men generally to show that company property has been used by the shipper, and that if it was taken away on the car the agent of the company at the destination was to collect the value of the property so used. It is not used by railroad men generally to mean that the property has been stolen, but simply to keep track of the railroad company's property. When I used the word confiscated on this bill I did not intend to indicate that Mr. Skelley had stolen these posts. I used it for the purpose of informing the agent at Kansas City that there were eight fence posts on this car belonging to the railroad company, and that if the consignee took them away he was to pay their value, which was eighty cents. I always understood it to mean when you wanted anything you just went and took it and suffered the consequences, that is, took it with the understanding that it wasn't mine, but that I would use it and would expect to make good to the owner whenever he called on me for it.

The petition in this case is somewhat different from the usual form of charging that defendant falsely

and maliciously published of and concerning the plaintiff the defamatory words, setting them out *in haec verbae*, thereby meaning and intending to charge, etc. —setting out whatever libelous meaning the plaintiff thinks the words will support.    In this case it is charged thus: "Plaintiff further says that in loading said car with said logs he used eight fence posts for the purpose of securing said logs on said car, but that said fence posts belonged to the plaintiff and not to the defendant, and that by sending said freight bill to said consignee containing said words and figures, viz.: 'For 8 company fence posts at 10c confiscated by shipper, 80,' the defendant falsely and maliciously intended to charge and publish, and did charge and publish, that the plaintiff had unlawfully taken, stolen and carried away eight fence posts belonging to the defendant of the value of eighty cents and that the said words and figures were so understood by said consignee and its officers and servants."

There was no proof whatever as to the way in which the consignee or anyone else understood these words.  The plaintiff concedes this and says that this innuendo (?) may be treated as surplusage in that the words are unequivocal and actionable *per se* and can be stripped of the useless luggage contained in the innuendo and still make a case for the jury.  This concedes that the language and proof does not support the meaning and charge given by the innuendo, to-wit, larceny.  But plaintiff contends that the words charged are inoculated with and carry their own, though different, poison amounting to slander under the statutory definition, section 4818, Revised Statutes 1909, to-wit:  "A libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, or any malicious defa-

mation made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives and friends. [R. S. 1899, sec. 2259.]''

This definition is not different from the common law definition as is pointed out in Kenworthy v. Journal Co., 117 Mo. App. 327, 335, 93 S. W. 882, where it is said that the object and purpose of the statute is to make all libels misdemeanors, i. e., criminal, and not to make any publication libelous that was not such at common law.

In Callahan v. Ingram, 122 Mo. 355, 366, 26 S. W. 1020, the court said: ''The innuendo is intended to define the defamatory meaning which the plaintiff places upon the words used. In case the defamatory meaning is apparent from the language charged there is no necessity for an innuendo at all. The purpose of the innuendo, and its effect upon the party pleading it, is thus expressed by Townshend in his work on Slander and Libel (sec. 338): 'Where language is ambiguous and is as susceptible of a harmless as of an injurious meaning, it is the function of an innuendo to point out *the meaning* which the plaintiff claims to be the true meaning, and the meaning upon which he relies to sustain his action. This applies, whether the ambiguity be patent or latent, and whether or not there are any facts alleged as inducement. By this means the defendant is informed of the precise charge he has to meet, and to deny or justify; but the plaintiff is subjected to the risk that if he claims for the language a meaning which is not the true one, or one which he is unable to make out satisfactorily, he may be defeated on the ground of variance or failure of proof. For, when the plaintiff, by his innuendo, puts a meaning on the language published, *he is bound by it,* although that course may destroy his right to maintain the action.' [To the same effect, see Starkie on

176 Mo. App. 11

Slander and Libel (Folkard's Ed.), sec. 446; Newell on Defamation, Slander and Libel, p. 629, sec. 39; Odgers on Libel and Slander, p. 100.]''

In Ukman v. Daily Record Co., 189 Mo. 378, 394, 88 S. W. 60, the court said: ''Here, it is contended that these words impute insolvency or dishonest trickery in a business way. But by this contention of appellant it is sought to enlarge the meaning of the words, as set forth in the innuendo, which he may not do. [13 Ency. Pl. and Pr., p. 55; Townsh. on S. and L., sec. 338.] If appellant desired to attribute such a meaning to the words, he should have so framed his innuendo.'' In the late case of Walsh v. Pulitzer Pub. Co., 250 Mo. 142, 150, 157 S. W. 326, the court stated the principle thus: ''For instance, where words have two meanings, one of them harmless and the other injurious, the innuendo may properly point out the injurious meaning. [Curtis v. Iseman, 137 Ky. 796; Joralemon v. Pomeroy, 22 N. J. L. 271; Grant v. N. Y. Herald Co., 138 App. Div. (N. Y.) 727; Gosling v. Morgan, 32 Pa. St. 273.] . . . A court will not in support of a pleading infer a criminal intention when the pleader has not ventured directly to aver its existence. [Grand v. N. Y. Herald Co., 138 App. Div. (N. Y.) 727, 123 N. Y. Supp. 449; Bartholomew v. Bentley, 15 Ohio, l. c. 670.]'' It will thus be seen that the office of the innuendo is to point out the poisonous meaning whenever the words are of doubtful or double meaning, one libelous and the other not, and in such cases the innuendo is a necessary part of the petition and may not be enlarged or departed from either when the proof is made by extrinsic evidence or is inferred from the words themselves. [Ukman v. Daily Record Co., 189 Mo. 378, 393-4, 88 S. W. 60.] Much more would this be true where, as in this case, what is termed the innuendo is the whole charging part of the petition. It will be noted that this petition instead of alleging that defendant published certain

false and slanderous words thereby meaning and intending to charge plaintiff with larceny, it alleges that defendant falsely charged plaintiff with larceny by publishing these words. The whole gist of this petition is that defendant charged plaintiff with larceny and the publication of these words is merely stated as the means of so doing.

It is true that in Callahan v. Ingram, 122 Mo. 355, 367, 26 S. W. 1020, and in Cook v. Printing Co., 227 Mo. 471, 526, 127 S. W. 332, the court held that the innuendo and the meaning of the words pointed out thereby may be disregarded and treated as surplusage when not necessary to state a cause of action. But, as we have just shown, the innuendo is necessary to state a cause of action in all cases where the words published are of doubtful, double or equivocal meaning and might, when unaided by extrinsic evidence, be understood in a harmless sense. In order, therefore, to disregard the innuendo, the published words must not only be libelous *per se* in the sense that the jury might have a right to infer and find the libelous meaning from the words themselves and the publication (McGinnis v. Knapp & Co., 109 Mo. 131, 140, 18 S. W. 1134), but such words must be necessarily libelous under any fair interpretation and rebut every reasonable inference to the contrary. Learned counsel for appellant correctly says: ''It may have two or more meanings, and although it may not be certain from the publication itself in what sense it was used, if its several meanings are *all* libelous *per se,* it is not necessary to prove in what sense it was used or understood.'' We also readily agree that in order to be libelous *per se* it is not essential that words should involve imputation of crime. [25 Cyc. 253; McGinnis v. Knapp & Co., 109 Mo. 131, 18 S. W. 1134; Sullivan v. Commission Co., 152 Mo. 268, 53 S. W. 912.] On the point now being discussed, the case of McGinnis v. Knapp & Co., supra, is not applicable for the reason that the court

was there considering, on a demurrer to the petition, whether the language used was capable with the aid of extrinsic evidence of bearing the meaning put on it by the innuendo; and held that, as the demurrer admits the falsity of the charge and the meaning placed thereon by the innuendo and that the readers so understood it, the question is always one for the jury unless the language is so unquestionably not libelous that the court will not listen to proof that it was in fact such and was so understood.

The only word in the publication now being considered which is claimed to be libelous is the word "confiscated," and it is argued that such word in a popular sense carries the idea of high-handed dealings —the taking of another's property without intent to pay for same. The question, however, presented under the pleadings here is, does such word necessarily carry such meaning? We think not.

On the contrary, we think that, taken in connection with the context and under the circumstances and purpose for which the freight bill was made out, it is not fairly susceptible of any libelous meaning. Technically "confiscate" means to "transfer property from private to public use; or to forfeit property to the prince or State; either an act of penal justice for punishment of great crimes against the State, or the exercise of a belligerent right against the property of public enemies; the act of a sovereign against a rebellious subject." [8 Cyc., p. 567.] Similar definitions will be found in Ware v. Hylton, 3 U. S. 199, 234, 1 L. Ed. 568, and State ex rel. Rosenblatt v. Sargent, 12 Mo. App. 228, 234. Such too is the common meaning when we speak of any legislative act fixing rates to be charged by public service corporations. Such laws and rates are said to be confiscatory when they compel such corporations to serve the public without any or an inadequate compensation and thus in effect transfers property from private to public use. In this

sense an individual could not confiscate anything; only the State or government can confiscate, that is, take or transfer private property to a public use.    In this sense the context in which the word is used carries its own antidote for any supposed poison.    There are many cases holding that where the publication, taken as a whole, negatives the harmful meaning or shows the alleged wrongful act to be impossible, the words are not actionable.    Thus in Newell on Slander and Libel (2 Ed.), 117, the following language of Chief Justice SHAW of the Supreme Court of Massachusetts is stated to be the rule:    "The natural and most obvious import of the word 'steal' is that of a felonious taking of property, or larceny, but it may be qualified by the context.    As if one says of another, 'He stole apples from my trees,' it imputes a trespass and not a felony, and the words are not actionble."    And in Ogden v. Riley, 14 N. J. L. 186, the words complained of were, "You are a thief, you have stolen my marle." These words were held to be not actionable because marle, being a mineral, was a part of the freehold, and therefore was not a subject of larceny.    [Ogden v. Riley is cited and followed in Trimble v. Foster, 87 Mo. 49.]    Thus, it is not actionable to say of a man, "He stole my farm," because a farm is not the subject of larceny.

We apprehend, however, that these rulings mean no more than that the language charged when read with the context does  not support  the particular charge alleged.    While the publication of an accusation of stealing a farm will not support an innuendo of larceny, we apprehend that it might support an innuendo of dishonesty or unfair dealing.    In the present case, however, as in Diener v. Publishing Co., 230 Mo. 613, 132 S. W. 1143, and 232 Mo. 416, 135 S. W. 6, the context, circumstances and purpose of the  publication negative any bad intent or meaning.    In that case the words "kill" and "killer" when taken in connection

with the context were held not fairly susceptible of being construed to mean the unlawful or criminal taking of human life. In the first case, 230 Mo. 613, 628, 132 S. W. 1143, the court said: "To be sure, he might have used daintier language and put his screed into a softer or more roundabout form. He might have said the child was overtaken by an automobile and came to its death thereby, or its death was caused thereby, or that its death ensued, or that it gave up the ghost, etc." And in the second one, 232 Mo. 416, 135 S. W. 6, it is said: "Libel cannot hang on so slender a thread as a mere matter of taste in the penman's selection of one word instead of another one, interchangeable as a synonym or (by condensation) in using laconically one word instead of expending and diluting his idea into a phrase, thereby toning and softening it down."

In this case the word "confiscated" was used and published only in presenting a freight bill for payment. No one saw the publication except the consignee and that only in the regular course of business. The facts negative any intent or concerted action of the local agent and clerk in the freight office to give it publicity or to do the plaintiff any harm. The language charged to be libelous merely constituted one small item of several which were to be paid by the consignee and charged back to the plaintiff and no more indicated that plaintiff was wrongfully refusing or trying to evade the payment of this item than the freight charges or demurrage constituting the other items. The plain inference is that the defendant was making no objection to the taking and use of its fence posts provided the same be paid for.

It is true that words when printed may constitute libel, which, if spoken, would not constitute slander. [Ukman v. Daily Record Co., 189 Mo. 378, 391, 88 S. W. 60.] But if the reason there given, that "an oral

charge merely falls upon the ear and the agency of the wrongdoer in inflicting injury comes to an end when his utterance has died on the ear, but not so with the written or printed charge which may pass from hand to hand indefinitely and may renew its youth, so to speak, as a defamation as long as the libel itself remains in existence, and hatch a new crop of slanders to be blown hither and yon like thistle down at every sight of the libel, so that a printed slander, when published, takes a wider and more mischievous range than mere oral defamation and is more reprehensible in the eye of the law. (Cooley on Torts (2 Ed.), 240; Odgers on Lib. and Sl. (2 Ed.), 3; Dexter v. Spear, 4 Mason, 115)'' is the basis of the distinction; such distinction does not exist here for the inference here is that no one except the person paying the freight bill ever saw the publication. If it be true, as often held, that a slander only exists in the ear of the hearer (Diener v. Publishing Co., 230 Mo: 613, 629, 132 S. W. 1143), and a libel in the apprehension of the reader, then it is significant that the only reader of this alleged libel was not called as a witness in the case.

Our conclusion is that the court did not err in sustaining the demurrer and the judgment will be affirmed.

*Robertson, P. J.*, concurs. *Farrington, J.*, concurs.