Clay CHASTAIN, Appellant Pro–Se,

v.

KANSAS CITY STAR, Emanuel Cleaver, and Jeffrey Spivak, Respondents.

No. WD 58879.

Missouri Court of Appeals, Western District.

June 12, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 24, 2001.

Clay Chastain, Kansas City, Pro Se.

David Vogle and Timothy McNamara, Kansas City, for Respondent.

HOLLIGER, Judge.

Clay Chastain appeals the trial court's judgment[1] dismissing his defamation petition for failure to state a claim upon which relief can be granted. Chastain's petition claimed that the then Mayor Emanuel Cleaver made defamatory statements that were then quoted by writer Jeffrey Spivak in a Kansas City Star article. Finding that the matters of which he complains

could not be construed to be capable of a defamatory meaning, we affirm the dismissal.

Chastain has been a community activist in the Kansas City, Missouri, area from 1991 to 2000. In addition to conducting a number of petition drives for restoration matters in Kansas City, he also conducted three petition drives to implement a light rail system in Kansas City in 1998, 1999 and 2000. Chastain's 1998 drives resulted in the issue being placed on the November 3, 1998, ballot.

On October 29, 1998, the Kansas City Star ran a front-page article with the headline, "Broad Based Coalition Sets out to Defeat Light Rail Ballot Initiative," and a subheading that claimed, "Chastain Plan Called Threat to Union Station, But He Disputes That." The article quoted statements by Mayor Cleaver claiming that Chastain's plan "will stop the Union Station restoration project in its tracks." Cleaver was further quoted as saying that Chastain's plan called for the demolition of a portion of Union Station where Science City was to be located. On October 30, 1998, the Star printed an article with the headline, "Chastain Defends Light Rail Initiative," by the same writer, Jeffrey Spivak.

On November 3, 1998, the light rail initiative was defeated after obtaining only 45 percent of the votes. On November 5, 1998, The Kansas City Star published the results of two polls taken in September of 1998 by Chastain's opposition, which indicated Chastain's light rail initiative had a majority support.

Chastain contends that voters who would have otherwise voted for his initia-

---

1. Chastain's case against the defendants here was consolidated with another suit against Steve Glorioso, a political consultant, and Frank Smist, a professor and political commentator. The same judgment now appealed dismissed those claims as well. Chastain makes no complaint in his brief with regard to that portion of the dismissal.

tive changed their vote after reading the two stories. Chastain argues that the two stories contained false statements of fact and that he suffered the following damages as a direct result of the statements printed in the Kansas City Star: 1) damage to his reputation; 2) failure of his light rail initiative in a city-wide election; 3) emotional distress and sleeplessness; 4) psychological distress; and 5) feelings of shame and despair. He also claimed that he was entitled to punitive damages because of the conduct of the Star, Spivak and Cleaver.

During pretrial motions, the defendants filed a motion to dismiss, which was granted by the trial court. The trial court stated in its judgment that the alleged defamatory statements were either true or statements of opinion and not defamatory as a matter of law. Therefore, the trial court found that Chastain failed to state a claim on which relief could be granted.

## STANDARD OF REVIEW

Whether a defamation petition states a claim is a question of law. *Brown v. Kitterman*, 443 S.W.2d 146, 150 (Mo. 1969). We apply the same standard used by the trial court. That is, we must determine "whether the communication set forth in the petition ... is capable of a defamatory meaning." *Carey v. Pulitzer Publ'g Co.*, 859 S.W.2d 851, 855 (Mo.App. 1993). To determine whether a statement is defamatory, a court should read the words "in connection with the whole publication, rather than in isolation, and they must be taken in their plain and ordinary meaning." *Anton v. St. Louis Suburban Newspapers, Inc.*, 598 S.W.2d 493, 497 (Mo.App.1980). We construe the words in their most innocent sense. *Walker v. Kansas City Star*, 406 S.W.2d 44, 51 (Mo. 1966). And, if a statement is capable of two meanings (one defamatory and one non-defamatory) and can be *reasonably*

construed in an innocent sense, the court must hold the statement nonactionable as a matter of law. *Ampleman v. Scheweppe*, 972 S.W.2d 329, 333 n. 2 (Mo.App.1998) (emphasis in original). In other words, we determine "whether the communication set forth in the petition, together with the matters of inducement and innuendo which may be contained, is capable of a defamatory meaning." *Carey*, 859 S.W.2d at 855.

We address, initially, the respondents' argument that the statements in question were not spoken of and concerning Chastain. "In order for ... words to be actionable, they must refer to the plaintiff and to be understood by others as referring to the plaintiff." *May v. Greater Kansas City Dental Soc'y*, 863 S.W.2d 941, 944 (Mo.App.1993). A fact issue exists if some question remains as to whether the claimed offensive words were spoken of and concerning the plaintiff. *Hoeffner v. W. Leather Clothing Co.*, 161 S.W.2d 722, 727 (Mo.App.1942).

The precise defamatory statements alleged in Chastain's petition are:

From an October 29, 1998, news story:

a. "Mayor Emanuel Cleaver says voter approval of Clay Chastain's plan will stop the Union Station restoration project in its tracks."

b. " 'It [Plaintiff Chastain's plan] would end the Union Station project as we know it,' Cleaver said Wednesday."

c. " 'It [Plaintiff Chastain's plan] calls for the demolition of a portion of Union Station where Science City is to be located.' " [quoting Mayor Cleaver]

From an October 30, 1998, news story:

a. "Part of the office building's [Pershing II's] existing parking garage would have to be demolished to accommodate the rail line."

b. "The station's Scott [Andy Scott, Executive Director of USAC] was more

blunt: 'You're essentially destroying three levels of parking at Pershing Square,'" he said. "You could never get that done. It gets back to why this is such a hallucination."

c. "Chastain expects the platform to extend about 200 feet. Roughly half the length of the north wing. Again he envisions the platform and rail tracks cutting off part of the parking garage."

The petition further alleges the Kansas City Star published these statements with knowledge that they were false or with reckless disregard of their truth or falsity at a time when the newspaper had serious doubts that they were true. The libel count against Spivak made the same allegations as were made against the newspaper and alleged that Spivak had exhibited a pattern of distorting facts and Chastain's prior initiative efforts.

Chastain's libel count against Mayor Cleaver alleged that the two quotes from the Kansas City Star article set forth above were defamatory and were either false or made with reckless disregard to their truth or falsity. The petition further alleged that Mayor Cleaver had exhibited a pattern of distorting and maligning Chastain's character in other statements made by Cleaver in the past about activities of Chastain.

■ The parties spend much of their argument in the briefs debating whether the words were defamatory, were true or were privileged statements of opinion. We need not reach these issues for the more fundamental reason cited above that none of the complained of statements were spoken "of or concerning" Chastain as those terms are used in the law of defamation. Defamatory words "must be of such a nature that the court can presume, as a matter of law, that they will tend to disgrace and degrade the person or hold him to public hatred, contempt or ridicule or cause him to be shunned and avoided; in other words they must reflect on his integrity, his character and his good name and standing in the community and tend to expose him to public hatred, contempt or disgrace." *Carey*, 859 S.W.2d at 855.

■ Clearly, the statements in question here, even if we consider the pleaded extrinsic facts and innuendo concerning the parties' prior interrelationships, relate only to Chastain's light rail transit plan and the upcoming initiative vote. If they ridicule anything it is the plan. Chastain conceded as much in oral argument. Although in his petition he generally complains of damage to his reputation and emotional distress, he also makes several allegations about how the allegedly false statements made voters change their vote by misrepresenting his plan. The petition then prays for damages "for failure of his light rail initiative in a city-wide election." Then, in his brief on appeal, Chastain argues that while statements about political candidates may be immune from defamation claims, comments regarding proposals or initiatives "need [not] also accept derogation." These allegations and arguments reflect a recognition that the statements are about the plan and the initiative, and not about Chastain. Because the statements were not about Chastain, his petition fails to state a claim for defamation.

The judgment is affirmed.

PAUL M. SPINDEN, Chief Judge, and ROBERT G. ULRICH, Judge, concur.